# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

JOHN J. KOSLOW on behalf of Dakota Koslow   )
in the matter of DANA LEE KOSLOW, deceased,  )
       Plaintiff,               )
                           )
       v.                 )    CAUSE NO.: 2:08-CV-159-PRC
                           )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security       )
Administration,               )
        Defendant.         )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff John J. Koslow on behalf of Dana Lee Koslow, deceased, on May 22, 2008, and a Social Security Opening Brief [DE 22], filed by Plaintiff on January 3, 2009. Plaintiff requests that the decision of the Administrative Law Judge, dated December 20, 2005, be remanded and reversed for the denial of Disability Insurance Benefits and Supplemental Security Income Benefits for the period beginning August 15, 1999. For the following reasons, the Court grants Plaintiff's request and remands this case for further proceedings consistent with this Opinion and Order.

## PROCEDURAL BACKGROUND

On December 29, 1998, Dana Koslow concurrently applied for Disability Insurance Benefits and Supplemental Security Income Benefits, alleging that she became disabled as of August 15, 1998. Ms. Koslow's applications were initially denied and again upon reconsideration. Ms. Koslow then filed a timely request for an administrative hearing, and, on April 10, 2000, Ms. Koslow appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ"). In a decision dated June 21, 2000, the ALJ issued a decision finding Ms. Koslow not disabled. After

the Appeals council denied a request for review, Ms. Koslow subsequently initiated a civil action for judicial review of the Commissioner's final decision, and, on October 13, 2004, Magistrate Judge Andrew P. Rodovich issued an Opinion and Order remanding the case for further proceedings.

On remand, a second administrative hearing was held on July 14, 2005, before a new ALJ. Dr. Jilhewar testified as a medical expert, and Mr. Pagella testified as a vocational expert. The ALJ issued a decision on December 20, 2005, finding that Ms. Koslow was disabled for a period beginning August 15, 1998 (the alleged onset date), through August 14, 1999, and that as of August 15, 1999, Ms. Koslow was no longer disabled as a result of medical improvement in her condition. The ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is only insured for benefits as of the established onset date through March 31, 2004.

2. The claimant has not engaged in substantial gainful activity since August 15, 1998.

3. The medical evidence establishes that the claimant has hearing loss in the right ear, residual headaches, dizziness (loss of balance), vision disturbance, confusion, depression, and anxiety. She was also diagnosed with closed head injury; a subarachnoid hemorrhage; a right pariototemporal skull fracture; a right zygomatic arch fracture; a right clavicular fracture; a lumbar traverse process fracture at the L1, L3, and L4 levels; wedging of the T7 and T8 vertebral bodies; several broken ribs; a broken nose; and meningitis (Exhibits 19F/12 and 28F/5). These medically determinable impairments cause significant limitations in the claimant's work related functioning and are, therefore, severe within the meaning of the Regulations.

4. There are no objective medical findings that precisely meet or medically equal the criteria of any listed impairment in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's assertions concerning her ability to work are [not] credible.

6. From the claimant's alleged disability onset date August 15, 1998 through August 14, 1999, the claimant met Listing 11.04B. As of August 15, 1999, there was

2

medical improvement in the claimant's condition and physical impairments no longer preclude the performance of even unskilled work on a sustained basis.

7.  As of August 15, 1999, the evidence of record as a whole supports a finding that the claimant has the residual functional capacity for performing the exertional and nonexertional requirements of work, except for that more exertionally demanding than sedentary work, lifting no more than 10 pounds, standing/walking for approximately 2 hours in an 8 hour workday, and sitting for at least 4 hours in an 8 hour workday.  Other limitations include simple, routine work; no work requiring bilateral hearing, no work at unprotected heights; no work around dangerous moving machinery; no work around open flame and bodies of water; no concentrated exposure to heat.

8.  The claimant has been unable to perform the requirements of any of her past relevant work at any point relevant to this decision.

9.  The claimant is a younger individual age 45-49.

10.  The claimant has a high school education.

11.  The claimant has an unskilled work background.

12.  Taking into account the claimant's residual functional capacity, age, educational background, and employment history, the vocational expert testified that the claimant is capable of making a vocational adjustment to other work and that given all of these factors there were other jobs existing in significant numbers in the national economy that the claimant could perform.  Examples of such jobs include work as an assembler, with 8,600 jobs available regionally; a sorter, with 1,200 jobs existing regionally; or a hand-packer, with 4,200 jobs existing regionally.

13.  The claimant is no longer under a disability, as defined in the Social Security Act (20 CFR §§ 404.1520(g) and 416.920(g)).

R. at 494-95.  Following the Appeals Council's denial of Ms. Koslow's request for review of the second decision, Ms. Koslow initiated the instant civil action for judicial review of the Commissioner's final decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.

Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A.  Background

Ms. Koslow was born in 1956, was forty-one on August 15, 1998, and was forty-eight in December 2005.  She completed tenth grade, earned a veterinary assistant diploma, and worked most of her adult life, including as a veterinary assistant, a landscaper, and a house cleaner.  She stopped working following her injuries from a motor vehicle accident on August 15, 1998.

### B.  Medical Evidence

*1.  Medical evidence prior to August 15, 1999 (the date of medical improvement found by the ALJ)*

On August 15, 1998, Ms. Koslow was involved in a motor vehicle accident and suffered a closed head injury and multiple fractures as confirmed by CT scans and x-rays, including a right side skull fracture (zygomatic arch fracture and fracture of the right temporoparietal area); right medial clavicle fracture in two places; bilateral rib fractures; lumbar spine (transverse process) fractures at L1, L3, and L4 levels; and thoracic spine injury.  Marc Levine, M.D., a neurosurgeon, treated and monitored Ms. Koslow at the hospital.  Two weeks after the accident, Ms. Koslow was transferred to rehabilitation for occupational, physical, recreational, and speech therapies.  On October 2, 1998, Ms. Koslow was discharged from rehabilitation.

In November 1998, Dr. Levin noted that Ms. Koslow was doing better, and he recommended psychological intervention and that she see a neural ophthalmologist.  In December 1998, Dr. Levin noted that the neurological exam was normal but noted that she had a "major psychological problem."  R. 240.  In March 1999, Dr. Levin saw Ms. Koslow for the last time and told her that there was "nothing further to do regarding her symptoms, except to wait and see."  R. 790.

Between October 1998 and February 1999, Ms. Koslow participated in physical and mental rehabilitation and achieved or partially achieved almost all goals.

On January 15, 1999, Ms. Koslow began psychiatric treatment with Bhawani Prasad, M.D., a psychiatrist. She saw Dr. Prasad again in February and May 1999, and her depression was treated with medication.

On January 25, 1999, Carl S. Hale, Psy.D., a state agency consultative physician, evaluated Ms. Koslow. Dr. Hale noted her unusual gait with "notably poor equilibrium and proproception." R. 221. He tested Ms. Koslow's memory with objective tests and diagnosed her with depression, alcohol abuse in early remission, nicotine dependence, and mild to mildly moderate cognitive disorder with a GAF of 52.

On March 2, 1999, Ms. Koslow was examined by an independent agency physician, Dr. Zeitoun, who found that Ms. Koslow had hearing loss in the right ear but was able to hear and understand conversational voice. A physical examination was essentially normal but for Dr. Zeitoun's observation that Ms. Koslow had "unpredictable gait." Dr. Zeitoun mentioned that Ms. Koslow was able to get on and off the examination table without difficulty and opined that support of an assistive device was not needed. Dr. Zeitoun also noted, "Patient had a problem with balance during the exam. The gait was unpredictable with no clear pattern [and she] gave the impression that she was unsteady." R. 236. Dr. Zeitoun's clinical impression was that Ms. Koslow had residual right ear hearing loss and residual dizziness as a result of the head injury.

Arthur H. Katz, M.D., S.C., who treated Ms. Koslow for complaints related to her nose, noted on March 19, 1999, that Ms. Koslow could not hear out of her right ear but that her left ear was okay.

On April 2, 1999, Steven Roush, M.D., reviewed the record on behalf of the state agency and opined that Ms. Koslow could perform a range of medium work that involved no ladders, ropes, or scaffolds, occasional balancing and climbing stairs, and other postural functions frequently. The findings were affirmed by Dr. A. Lopez.

In May 1999, Dr. Levin completed a physical Residual Functional Capacity ("RFC") assessment for the August 15, 1998 onset. Dr. Levin reported that Ms. Koslow had "significant" closed head injury with subarachnoid hemorrhage, and "severe" cognitive problems. Dr. Levin mentioned that Ms. Koslow had ataxia, weakness on left side, and diplopia and opined that Ms. Koslow could perform less than sedentary work such as occasionally lift less than 10 pounds, stand less than two hours in an 8-hour work day, and sit less than six hours in an 8-hour workday. Dr. Levin opined that Ms. Koslow could "never" climb stairs, and could never balance, stoop, kneel, crouch, or crawl and indicated that she was limited in manipulative limitations such as reaching, handling, fingering, and feeling. Related to her diplopia, Dr. Levin noted limited depth perception and accommodation. He indicated no limitations with regard to hearing or environmental conditions.

Ms. Koslow was evaluated by Dr. Lois Ann Polatnick, a neuro-ophthalmologist, in July 1999, for her vision impairments. Dr. Polatnick diagnosed Ms. Koslow with "persistent diplopia," or vertical double vision, caused by a traumatic 4th nerve palsy sustained during her motor vehicle accident and prescribed prism glasses for her condition. Dr. Polatnick explained that, since Ms. Koslow's "degree of diplopia had remained stable over at least [seven] months," this condition was not expected to change. R. 309. Dr. Polatnick's treatment note dated July 1999 indicated that Ms.

Koslow no longer had episodes of double vision when wearing glasses but that Ms. Koslow was "still photosensitive." R. 310.

*2. Evidence After August 15, 1999 (the date of the ALJ's finding of medical improvement)*

On August 16, 1999, Dr. Prasad evaluated Ms. Koslow's mental status and completed a Report of Psychiatric Status, diagnosing Major Depression, Moderate; Mild Cognitive Impairment; and Anxiety with a GAF score of 55. Dr. Prasad indicated that Ms. Koslow's impairment was severe. He noted that she was depressed, anxious, and moody since the car accident but that she was more anxious than depressed. Related to functional capacity, Dr. Prasad found that Ms. Koslow was able to do routine chores and that her relationship with family members involved frequent arguments in the house with her daughter and boyfriend. Dr. Prasad indicated that Ms. Koslow would not be able to attend to a simple repetitive task continuously for a two-hour period of time, that her anxiety and cognitive impairment would cause her to make lots of errors, and that she had very poor tolerance for work situations such as regular attendance and completing tasks. Dr. Prasad opined that Ms. Koslow's current prognosis was fair, that she had a moderate response to Xanax, and, under "signs of progress," that her anxiety was under control with Xanax. R. 284. Dr. Prasad opined that Ms. Koslow would be "unable to work" due to impairments with memory and anxiety for an indefinite duration, and he advised that she be reevaluated in one year. R. 279.

In September 1999, R. Klion, Ph.D. reviewed the record on behalf of the state agency and opined that Ms. Koslow had moderate limitations but retained the ability to complete simple chores and tasks. He opined that the degree of reported impairment exceeded what was expected based on the objective medical evidence.

Between August 1999 and April 2000, Dr. Prasad saw Ms. Koslow four times and included sparse comments about her subjective complaints in his notes. In April 2000, Ms. Koslow saw Dr. Prasad and indicated that her medication was probably working. Dr. Prasad then completed a Psychiatric Review Technique form. He noted anxiety and depression and mentioned symptoms of sadness, crying, irritability, tension, poor concentration, and poor memory. Dr. Prasad noted that Ms. Koslow had mood disturbances accompanied with pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty with concentration or thinking. He opined that Ms. Koslow had persistent anxiety accompanied with motor tension, apprehensive expectation, and vigilance and scanning. Dr. Prasad found that Ms. Koslow had moderate restrictions of activities in daily living; moderate difficulties in maintaining social functioning; and often had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. He also opined that Ms. Koslow had "continual" episodes of deterioration or decompensation in work or work-like settings, but he had insufficient evidence to opine as to whether Ms. Koslow had a complete inability to function independently outside the home.

Subsequently in April 2000, Ms. Koslow went to the emergency room after cutting her hand on broken glass. She was described as ambulatory with an unsteady gate and was discharged after her wound was cleaned.

In April 2000, Dr. Polotnick wrote a letter indicating that Ms. Koslow's diplopia had been stable for over seven months and was not expected to change.

In June 2000, ALJ Wilkin issued the first decision in this case, denying benefits. That same month, Ms. Koslow saw Dr. Prasad for the last time for another two and a half years.

In July 2000, Dr. Levin completed a second physical RFC assessment based on the May 1999 assessment and the March 1999 office visit. However, he indicated on the front of the form that the RFC assessment was for twelve months after onset–August 15, 1999. All of his findings mirrored the May 1999 RFC.

In July 2000, Ms. Koslow went to the emergency room with complaints of dizziness and tinnitus (ringing in the ears) that had gotten worse the previous two days. A CT scan of the head was normal.

On April 10, 2001, Robert W. Marquis, M.D. performed a psychiatric consultation for an insurance company. Dr. Marquis reviewed Ms. Koslow's medical records from August 15, 1998, through July 2000 and evaluated Ms. Koslow's mental status for a duration of 50 minutes. Dr. Marquis noted that Ms. Koslow was driven to the examination by her ex-husband. Dr. Marquis found that, at that time, Ms. Koslow's main difficulties were with memory, dizziness, and hearing in her right ear. On mental status, Dr. Marquis observed that Ms. Koslow had

> some thought disorder that involved her suddenly losing track of her stream of conversation while talking. It was as though she would forget where her sentence or paragraph was leading, and she was never able to recover these thoughts except when I went over what she said, and then she was able to resume her conversation.

R. 575. Dr. Marquis noted that "[i]t is clear that she has a great many physical difficulties including dyplopia, loss of hearing in her right ear, episodes of falling, possible dizziness, as well as her memory disturbances." R. 576. Dr. Marquis noted that she described a "marked" impairment in activities of daily living such as inability to do routine tasks such as grocery shopping, or at times inability to cook own meals. R. 576. Ms. Koslow reported that she had no friends and had only occasional contact with her ex-husband and children with whom she did not get along very well. Dr. Marquis opined that Ms. Koslow did not exaggerate either her psychiatric or physical symptoms.

Dr. Marquis mentioned that based "solely" on the present examination and medical records, Ms. Koslow was unable to engage in further employment or gainful pursuit. Dr. Marquis noted the possibility that her disability may not be permanent, but that Ms. Koslow was unemployable based on the April 2001 evaluation.

In December 2002, Dr. Prasad again saw Ms. Koslow, and prescribed medication. He saw her again in February, March, June, and September 2003, but Ms. Koslow failed to show up for her appointments thereafter.

In April 2003, Ms. Koslow went to the emergency room and complained of left ear pain lasting for two weeks. She was diagnosed with an ear infection and discharged with medication.

In February 2004, Ms. Koslow filed a new application for disability while her previous appeal was still pending before the court. That same month, Dr. Prasad noted that he sent the "form" to "Disability." He listed cognitive impairment, chronic anxiety, and depression and opined that Ms. Koslow "cannot work" for six months and then should be reevaluated. In March 2004, Dr. Prasad saw her again for treatment. In May 2004, Dr. Prasad filled out a medical information form based on the March 2004 examination and opined that Ms. Koslow had "not shown much improvement in 6 years" and could not work due to memory, concentration, and anxiety impairments. R. 666-68.

In June 2004, J. Pressner, Ph.D., reviewed the record on behalf of the state agency and recommended an additional consultation with testing.

On August 13, 2004, Caryn Brown, Psy.D., performed psychological testing and a clinical evaluation on behalf of the state agency. Dr. Brown noted that Ms. Koslow exhibited "some difficulty with her concentration often changing topics when talking." She noted that after five minutes Ms. Koslow identified one item out of three items and that Ms. Koslow could not recall her

meal from the previous evening. Ms. Koslow had no impairment with speech or thought processes. Dr. Brown found that Ms. Koslow "demonstrated impairment in her ability to sustain her concentration and attention" and concluded that Ms. Koslow's overall memory functioning falls withing the upper end of the Borderline range suggesting cognitive impairment in the mild range. Dr. Brown diagnosed Ms. Koslow with a Major Depressive Disorder and assigned her a then-current GAF rating of 55.

Later in August 2004, Dr. Pressner reviewed the record and Dr. Brown's report and opined that Ms. Koslow did not have a markedly impaired mental condition. He noted that the WMS-III test scores ruled out the alleged memory/concentration problems reported by Ms. Koslow. Dr. Pressner opined that Ms. Koslow would have no trouble dealing with others and concluded that Ms. Koslow could perform simple repetitive tasks.

A September 14, 2004 progress note from Dr. Prasad reports that Ms. Koslow continued to have anxiety and depression periodically. He saw her again in March 2005. A July 1, 2005 progress note mentioned periodic anxiety and depression and that she reported that the Xanax and Lexapro "barely" help. On July 5, 2005, Dr. Prasad wrote a letter opining that Ms. Koslow has "chronic anxiety and depression which are not completely controlled by her medications, Xanax and Lexapro" and that Ms. Koslow is "unable to work." R. 598.

In September 2004, Magistrate Judge Rodovich remanded ALJ Wilkin's decision on the original applications; therein, the Court did not consider any evidence after July 2000. On remand, the hearing before the ALJ took place in July 2005, and ALJ Armstrong issued the decision underlying the instant appeal in December 2005. On November 5, 2007, Ms. Koslow died after cardiac arrest from a condition with an onset one to two days earlier.

### C. Plaintiff's Hearing Testimony

Ms. Koslow testified in July 2005 that she had reading glasses but still could not see well. She explained that she lost her previous prism glasses from which she did not see double and that she still sees double with her present glasses. She testified that she could read the large print on newspapers but not the small print and that she had to stand up to read the newspaper. The hearing was held through a closed-circuit television, and, in response to the ALJ's question, Ms. Koslow testified that she was able to see the ALJ on the television but not the number of fingers he held up. Ms. Koslow testified that she had headaches, that the shooting pain in her head was from the region of her right ear, that her headaches lasted an entire day about two times a week, that nothing helped her headaches, and that the frequency and intensity of her headaches had stayed the same over the years. Ms. Koslow testified that she did not understand or grasp her eleven-year-old daughter's school work. She explained that when her daughter would call for her she could not identify the location of the sound because of her hearing condition.

Ms. Koslow testified that she could not walk well, has equilibrium problems due to her right ear wherein she gets dizzy while walking, has a frequent tendency to fall while walking and has many scars on her legs, cannot tell how close she is to things and has a tendency to trip over things, and cannot stand for long as she has a tendency to get dizzy and fall. Ms. Koslow testified that sometimes she could walk two blocks and was uncertain if could stand longer than five minutes. Ms. Koslow testified that she continues to see her psychiatrist, Dr. Prasad, and that her medications take the edge off her depression and anxiety. She reported effects of sleepiness and fatigue or tiredness from her medications.

Ms. Koslow testified that she lived downstairs in her ex-husbands' house, could drive, sometimes shopped but "not much," could do laundry, and no longer cooked on the stove because she would burn herself but would use the microwave. Ms. Koslow did not have a bank account, and she would endorse her pension check of $608 so that her ex-husband could handle her finances. Ms. Koslow testified that her ex-husband also did the grocery shopping because of her tendency to forget and drop things. Ms. Koslow mentioned that "a lot of times" her ex-husband fed her. She explained that she was not allowed to wash any glassware because she would drop and break them. Ms. Koslow also reported that heat made her dizzy and sick. She testified that she did not like to go out and stayed in the basement of her ex-husband's house "most of the time." Ms. Koslow explained that she had trouble remembering things and that the doctor's office would remind her of her appointments. Ms. Koslow testified that her treating physicians had informed her that there was nothing more they could do for her.

### D. Testimony of Medical Expert

Dr. Ashok Jilhewar, an internal medicine specialist, testified that Ms. Koslow equaled Listing 11.04B ("Central nervous system vascular accident") for a closed period of one year from August 15, 1998, to August 14, 1999. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 11.04B. He opined that, during that period, evidence of unsteady gait because of vision and hearing impairments resulting from her head injury equaled motor disorganization of motor function in two extremities under the Listing. Dr. Jilhewar testified that, beginning August 15, 1999, "in the absence of physical organic medical records," Ms. Koslow was restricted to sedentary work based on her unsteady gait, specifically to lifting ten pounds occasionally and eight pounds frequently, sitting six hours in an eight-hour workday with sit/stand option, avoiding moving machinery, unprotected heights, ladders,

and ropes, and only occasional use of steps.  He noted that she did not seek medical attention for physical complaints between March 1999 and July 2000 and concluded, based on this absence of records, that her health was well between the visits, particularly because her CT scan and arterial blood gases in July 2000 were normal and because her complaint to the emergency room physician on July 16, 2000 was that she had experienced dizziness for only two days.

Dr. Jilhewar testified that this RFC did not take into account Ms. Koslow's mental impairments.  He noted that Ms. Koslow's diplopia was corrected by glasses.  Dr. Jilhewar questioned Dr. Levin's opinion regarding left side weakness because his own examination noted no neurological deficits with the exception of Ms. Koslow's eyes.

### E.  Testimony of Vocational Expert

At the hearing, vocational expert Edward Pagella was presented with a hypothetical individual "limited basically to sedentary exertional abilities with a sit/stand option, also limited to simple, routine work, SVP 1 or 2; no work requiring bilateral hearing . . . .  No work at unprotected heights or on dangerous moving machinery, that might accompany that, or open flames or bodies of water.  No concentrated exposure to heat."  R. 915-16.  Mr. Pagella testified that, although the hypothetical person could not return to Ms. Koslow's prior work, the individual could do work in the regional or national economy as an assembler, sorter, or hand packer.  Upon further questioning by the ALJ, Mr. Pagella testified that the hypothetical person could still do those jobs if also restricted to no more than superficial contact with supervisors, co-employees, and the general public; if also limited to frequent fine finger manipulation and forceful gripping; or also had restrictions of never climbing ropes, ladders, scaffolds, or stairs, never balancing, stooping, kneeling, crouching, or crawling, and standing less than two hours during the day.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55

F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e) & (f) & 20 C.F.R. § 416.920(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the

claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

However, if a clamant is found disabled for a closed period of time, the regulations provide a multi-step sequential evaluation for evaluating the medical improvement.  *See* 20 C.F.R. §§ 404.1594(f) & 416.994(b)(5).  The regulations also provide grounds for terminating disability without a finding of medical improvement. *See* 20 C.F.R. §§ 404.1594(d), (e) & 416.994(b)(3), (4).

## ANALYSIS

Plaintiff alleges the following deficiencies in the ALJ's decision: (1) the ALJ did not follow the proper regulatory scheme in finding medical improvement and failed to address the opinion of treating physician Dr. Levin; (2) the ALJ inaccurately assessed the severity of Ms. Koslow's mental functional limitations, improperly discounted the opinions of treating psychiatrist Dr. Prasad and examining psychiatrist Dr. Marquis, and made a flawed credibility determination; and (3) there is an unresolved inconsistency in the ALJ's credibility finding and the ALJ failed to comply with Social Security Ruling ("SSR") 96-8 in assessing Ms. Koslow's RFC.

### A. Medical Improvement

The ALJ found that Ms. Koslow's medical condition improved and that she no longer qualified as disabled as of August 15, 1999. Plaintiff argues that the ALJ did not make the requisite comparison of the prior and current medical evidence in his determination of medical improvement but rather presumed medical improvement based on Dr. Jilhewar's testimony, which itself was based on the absence of evidence. The Commissioner responds that the ALJ's reliance on the medical expert was proper to find both that Ms. Koslow was disabled and that she subsequently improved. The Commissioner also argues that Plaintiff relies only upon Ms. Koslow's subjective allegations during the closed period.

In the multi-step analysis utilized to evaluate whether a claimant continues to be disabled, if the claimant's impairments do not meet or equal an impairment in the Listings, the ALJ must determine whether there has been any medical improvement as demonstrated by a decrease in medical severity. *See* 20 C.F.R. §§ 404.1594(f) & 416.994(b)(5); *Lewis v. Barnhart*, 201 F. Supp. 2d 918, 930 (N.D. Ind. 2002). This determination is "made on the basis of the weight of the

evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."  42 U.S.C. §§ 423(f) & 1382c(a)(4); *see also* 20 C.F.R. §§ 404.1594(b)(6) & 416.994(b)(1)(vi).  The Social Security regulations define "medical improvement" as:

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528).

20 C.F.R. § 404.1594(b)(1); *see also* 20 C.F.R. § 416.994(b)(1)(i).

To determine whether medical improvement has occurred, the severity of the beneficiary's current medical condition is compared to the severity of the condition "at the time of the most recent favorable medical decision" finding disability.  20 C.F.R. §§ 404.1594(b)(7) & 416.994(b)(1)(vii). When, as in this case, the ALJ finds that the claimant is disabled for a closed period in the same decision in which he finds that a medical improvement occurred, the disability onset date is the date of comparison.  *Booms v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 739, 745 (E.D. Mich. 2003) (citing the Commissioner of Social Security's Program Operations Manual System (POMS) DI 28010.105(D)(3)(a)).  In his decision dated December 20, 2005, the ALJ found that Ms. Koslow was disabled for a closed period of time from August 15, 1998, through August 14, 1999.  Accordingly, the point of comparison is the disability onset date of August 15, 1998.

The ALJ found that Ms. Koslow was disabled for the closed period based on her physical impairments meeting or equaling Listing 11.04B.  However, he determined that she was no longer disabled as of August 15, 1999, when he found that "there was medical improvement" in her

condition and that her "physical conditions no longer preclude her performance of [ ] unskilled work on a sustained basis." R. 495. In making this finding, the ALJ adopted the opinion of Dr. Jilhewar.

Dr. Jilhewar opined that, based on evidence in the March 2, 1999 and March 4, 1999 medical records, "for a closed period from 8/15/98 through 8/14/99, I believe such a person would have . . . equaled motor disorganization of the two extremities, in this case unsteady gait and equaling because of the inability to see properly and hear properly and see or equal the listing of 11.04(b) which is for the stroke but as a result of the head injury." R. 912. However, he also testified moments earlier that, he does "not know her physical status between [March 4, 1999] and [July 16, 2000] when she was dizzy for two days." R. 911-12. He reasoned that Ms. Koslow was physically without dizziness and thus "well" between March 4, 1999, and July 16, 2000, when she was seen at the emergency room for dizziness, explaining that the emergency room doctor would not have written "dizziness for two days" if she had chronic dizziness. R. 911. He also noted that on July 16, 2000, a CT scan of the head was normal, and the arterial blood gases were normal. His opinion that she could work with certain restrictions following the end of the closed period on August 14, 1999, was based on "the absence of the physical organic medical records." R. 912.

Ms. Koslow last saw Dr. Levin in March 1999, approximately seven months after the accident and approximately five months prior to the end of the closed period of disability found by Dr. Jilhewar. In his notes from that visit, Dr. Levin reported that he told Ms. Koslow that "there is nothing further to do regarding her symptoms, except to wait and see." R. 790. Identifying this evidence, Dr. Jilhewar testified that Ms. Koslow equaled a listing at that time in March 1999. Although it is true that there are no medical records for Ms. Koslow's condition from that March 1999 report until July 2000, which was sixteen months later, the records from that July 2000

emergency room visit do not indicate that Ms. Koslow had only had the symptoms of dizziness and ringing in her ears for two days as reasoned by Dr. Jilhewar and adopted by the Commissioner.

Rather, the emergency room records show that Ms. Koslow was admitted on July 16, 2000 with a provisional diagnosis of "dizziness," "hyperventilation," "alcohol use," and "tinnitis." R. 809. The diagnosis found by the emergency room physician was "dizziness," "mild dehydration," "tinnitis." The record reports her "chief complaint" as "dizziness last two days," "'I feel a lot of noise in my ears,'" "traumatic brain injury as a result Rt ear deafness, disequillibrium to eyes," "sometimes unsteady gait." R. 813. The emergency record reports Ms. Koslow's statement that she has had persistent dizziness since her head injury but that it was worse on that date. R. 815. She reported that the dizziness was constant, that she had a "vague" sense of movement, that she was light-headed, that it had been severe, although it was mild when seen in the emergency room, and that it was worsened by changing positions or movement of the head. *Id.* Dr. Jilhewar did not address any of these notes in the record. Therefore, without a complete analysis of this emergency room record by the medical expert and in the absence of any other medical records in the intervening period, a conclusion of medical improvement based on a partial statement in the entire emergency room record almost a year after the end of the closed period is insufficient to support a finding of medical improvement.

Dr. Jilhewar's opinion that Ms. Koslow obtained medical improvement on August 14, 1999, appears based, in part, on an absence of evidence for that time period rather than a comparison of evidence. Although Dr. Jilhewar compares the medical evidence of March 1999 with that of July 2000, his identification of August 15, 1999 as the date of medical improvement can only be described as arbitrary from a medical perspective. At a minimum, it appears he selected that date

from an administrative perspective to allow Ms. Koslow to be considered disabled for a continuous period of twelve months in order to receive benefits; however, the decision that she stopped being disabled on that date does not appear to be based on medical findings but rather on the lack of treatment during that time period. He draws this conclusion notwithstanding the treating neurologist Dr. Levin's March 1999 opinion was that they would have to "wait and see" regarding her ongoing symptoms. In addition, Dr. Jilhewar opined that for a closed period of one year Ms. Koslow met or equaled listing 11.04(b) based on evidence of "unsteady gait" because of vision and hearing problems. However, Dr. Jilhewar noted that Ms. Koslow continued to have "unsteady gait" after the closed period because he recommended that she be restricted to sedentary work because of her unsteady gait. R. 912.

The Commissioner argues that Dr. Jilhewar reasonably inferred that medical improvement took place not long after March 1999 based on a lack of treatment and Ms. Koslow's subjective complaints in July 2000, thus indicating that the treatment she received in July 2000 was for recent, rather than chronic problems. However, as analyzed above, Dr. Jilhewar did not sufficiently address the entire July 2000 emergency room record in order for it to support such a conclusion. The Commissioner is correct that the statements in the July 2000 emergency record are based on Ms. Koslow's subjective complaints; however, as explored more fully in Part B.3 below, the ALJ cannot disregard Ms. Koslow's subjective complaints regarding the intensity or persistence of her symptoms "solely because they are not substantiated by objective medical evidence." SSR 96-7p at *6; *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Commissioner also cites *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), for its holding that a repeated failure to seek medical treatment provided support for the ALJ's

credibility finding in that case. However, in *Sienkiewicz*, the court had already found that the ALJ had sufficiently articulated his credibility determination, that the ALJ had correctly observed that the plaintiff's complaints of extreme pain were inconsistent with the opinions of all the doctors that had examined her, and that she had never sought treatment for her headaches. In this case, Ms. Koslow had been told by Dr. Levin that there was nothing she could do but wait and see whether her symptoms would improve. Neither the ALJ nor Dr. Jilhewar discuss the relationship between Dr. Levin's opinion and Ms. Koslow's lack of treatment from March 1999 through July 2000.

Although the Commissioner is correct that Dr. Levin's note does not indicate that her symptoms would actually continue or would continue at their March 1999 intensity, it does indicate that there was nothing further he could do for her, which serves as a possible basis for her lack of treatment in the months and year through July 2000 following his report. The ALJ did not cite any evidence in the medical records, reports, and opinions subsequent to August 15, 1999 that shows a decrease in the severity of Ms. Koslow's disabling symptoms or in her reporting of her physical symptoms. For example, in April 2001, independent physician Dr. Marquis referenced Ms. Koslow's "great many physical difficulties" including vision and hearing impairments, episodes of falling, and dizziness. R. 574, 576). The ALJ's general reliance on state agency physician's opinions over Ms. Koslow's treating and examining doctors is discussed in Part B.2 below.

Plaintiff also argues that the ALJ's failure to address the opinion of Dr. Levin, her treating physician, violates 20 C.F.R. § 404.1527(d),[1] which requires an ALJ to analyze every medical opinion on record. The Commissioner responds that an ALJ need not provide a written evaluation of every piece of evidence that is presented as long as it is evaluated. Section 404.1527 provides

---

[1] The parallel regulation for supplemental security income benefits is found at 20 C.F.R. § 416.927.

that the ALJ "will evaluate every medical opinion" received and that, generally, more weight is given to the opinion of examining and treating sources. *Id*. § 404.1527(d)(1), (2). Section 404.1527(d)(2) provides that an ALJ "will always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion." *Id*. Dr. Levin was Ms. Koslow's treating neurosurgeon, and his opinion that there was nothing more for him to do about "her symptoms, except to wait and see" is directly implicated in the finding of medical improvement. The ALJ does not mention his opinion at all, and thus does not give any reason in his decision for the weight given to this treating source opinion. The failure to address this opinion in the context of Dr. Jilhewar's testimony is reversible error because it is not clear what weight, if any, the ALJ gave to Dr. Levin's opinion. *See* 20 C.F.R. §§ 404.1527(d) & 416.927(d); *Day v. Astrue*, No. 08-3031, 2009 WL 1137726, at *4 (7th Cir. Apr. 28, 2009); *Gudgel*, 345 F.3d at 470; *Jenkins v. Astrue*, 544 F. Supp. 2d 736, 739 (N.D. Ind. 2008); *see also Smith v. Apfel*, 231 F. 3d 433, 438 (7th Cir. 2000) ("An ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion.").

After a review of the ALJ's opinion, the medical expert testimony relied on by the ALJ, and the evidence of record, the Court concludes that the ALJ failed to create an accurate and logical bridge between the evidence and his conclusion of medical improvement and failed to address the opinion of treating neurosurgeon Dr. Levin. Accordingly, this matter is remanded for the ALJ to consider all the evidence of record, including during the closed period, to determine if Ms. Koslow's impairments medically improved.

### B. Mental Residual Functional Capacity and
### Treating and Examining Psychiatrist Opinions

Plaintiff argues that, in determining Ms. Koslow's mental RFC, the ALJ improperly

discounted the opinions of treating psychiatrist Dr. Prasad and examining psychiatrist Dr. Marquis.

In this context, Plaintiff also argues that the ALJ erred in not finding Ms. Koslow's testimony fully

credible given the opinions of Dr. Prasad and Dr. Marquis.

In arriving at a claimant's mental RFC, the ALJ must assess the claimant's degree of

functional limitation in four functional areas: activities of daily living; social functioning;

concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3);[2]

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Pt. A, § 12.00C. In the first three areas, the ALJ utilizes a five-

point scale: none, mild, moderate, marked, and extreme; and in the fourth area, the ALJ uses a four-

point scale: none, one or two, three, four or more. *See* 20 C.F.R. § 416.1520a(c)(4). "The last point

on each scale represents a degree of limitation that is incompatible with the ability to do any gainful

activity." *Id.* If the ALJ finds that the rate of functioning in the first three categories is more than

"none" or "mild" and in the fourth area "none," then the ALJ must determine if the disability meets

or is equivalent in severity to a listed mental disorder. *Id.* at § 404.1520a(d)(2). If the ALJ finds that

the severe mental impairment does not meet or equal a listing, then the ALJ must assess the

claimant's residual functional capacity. *Id.* at § 404.1520a(d)(3). If limitations are found in one of

the four functional areas, the ALJ must "incorporate" these limitations in the hypothetical posed to

the VE. *See Kasarsky v. Barnhart,* 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that, "to the extent

---

[2] The parallel citations for an application seeking supplemental security income are found at 20 C.F.R. § 416.920a.

the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers").

After first acknowledging his obligation to apply the special technique, the ALJ recognized that Ms. Koslow's symptoms included memory impairment, disturbance in mood, and depression. He found that she did not satisfy the "A" and "B" criteria required to meet any medically determinable mental impairment identified in Section 12 of the Listing. In addition, he found that "[t]he medical evidence of record does not support a finding that the claimant experiences any marked functional limitations in her activities of daily living; social functioning; concentration pace or persistence. Nor is there any evidence to show frequent episodes of decompensation or deterioration in work like setting." R. 491. Thus, he concluded that "there is no evidence that the claimant's depression and anxiety and their impact on her functioning are of such severity that they render her completely unable to function outside of her home." *Id.* However, the ALJ did recognize that treating psychiatrist Dr. Prasad opined that Ms. Koslow had moderate limitations in the first three categories and that she had "continual" episodes of deterioration or decompensation in a work-like setting based on evaluations on August 16, 1999, and April 27, 2000. The ALJ also acknowledged Dr. Prasad's notes that Ms. Koslow appeared more anxious than depressed and that she demonstrated mild memory loss and a very poor tolerance for stress. In addition, the ALJ noted Dr. Prasad's diagnosis of major depression, moderate; mild to moderate cognitive impairment; and severe family stress.

*1. The accuracy of the ALJ's assessment of mental functional limitations*

To the extent Plaintiff argues in Part C of the opening brief that the "ALJ's assessment of the severity of mental functional limitations are inaccurate," the Court finds that the ALJ did not err

in finding that Ms. Koslow did not meet or equal a Listing for her mental impairment. Notably, Plaintiff does not pursue this argument in his reply brief.

First, even if the ALJ erred in finding that Ms. Koslow did not have a "marked" impairment in activities of daily living based on Dr. Marquis' report in which he mentioned that Ms. Koslow "describes a marked impairment in her activities of daily living," R. 576, any such error would be harmless because "marked" impairment in only one functional area would not meet a listing. *See* 20 C.F.R. Part 404, Subpart P, App. 1., Pt. A, §§ 12.00, 12.04B (requiring the requisite level of impairment in at least two of the four functional areas). Although Plaintiff suggests that Dr. Marquis also found "marked impairment" in social functioning, his report only provides that "[s]he states that she has no friends and has only occasional contact with her ex-husband and her children with whom she does not really get along very well." R. 576. A review of the record demonstrates that no other mental health specialist, including Dr. Prasad, suggested greater than moderate mental limitations, and thus the ALJ's finding is supported by substantial evidence.

Second, the ALJ did not err by finding that there were not "frequent" episodes of deterioration in light of Dr. Prasad's opinion of "continual" episodes of deterioration in a work-like setting. The Listings provide specific criteria for analyzing episodes of decompensation under the mental impairment listings:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a

halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(4). Dr. Prasad's records do not describe episodes involving such dramatic symptoms requiring hospitalization or similar intense treatments.

Therefore, substantial evidence of record supports the ALJ's assessment of the severity of Ms. Koslow's functional limitations and his decision that the evidence does not support a finding that Ms. Koslow's mental disability meets or is equivalent in severity to a listed mental disorder.

*2. Mental RFC*

In Part D of his opening brief and in Part II of his reply, Plaintiff argues that the ALJ improperly discounted the opinions of Ms. Koslow's treating psychiatrist, Dr Prasad, and her examining psychiatrist, Dr. Marquis, in formulating her mental RFC. The Commissioner responds that the ALJ reasonably determined Ms. Koslow's RFC based on the testimony of Dr. Jilhewar and the opinions of the state agency psychologists and examining consultants.

A treating source's opinion on issues of the nature and severity of a medical impairment is entitled to controlling weight if it is well-supported and not inconsistent with other substantial evidence in the record. *See Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2). Under *Clifford*, when a treating physician's opinion is given little weight or no weight, an ALJ must cite to a medical report or opinion that is inconsistent with the treating physician's opinion and provide "good reasons" for the weight accorded to a treating physician's opinion. 227 F.3d at 870

(citing *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994)); 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2). The Social Security Ruling provides that the ALJ must weight medical source statements and must provide "appropriate explanations for accepting or rejecting such opinions." SSR 96-5p. Nevertheless, the Commissioner is charged with determining the ultimate issue of whether a claimant is "disabled" or "unable to work." *Id.*; 20 C.F.R. §§ 404.1527(e) & 416.927(e).

### a. Dr. Prasad

First, Plaintiff argues that the ALJ failed to give the appropriate weight to the opinion of Dr. Prasad, Ms. Koslow's treating psychiatrist, and failed to provide an adequate explanation for the weight that he gave Dr. Prasad's opinion. In a July 5, 2005 signed letter, Dr. Prasad referenced Ms. Koslow's anxiety and depression, mentioned that Ms. Koslow's medications were not "completely" controlling her symptoms, and, thus, Ms. Koslow was unable to work. The ALJ declined to accord "any significant weight" to Dr. Prasad's opinion that Ms. Koslow is unable to work on the grounds that Dr. Prasad's July 5, 2005 assessment was contrary to his two previous reports and unsupported by medical findings. Although internal inconsistencies may be a good reason to deny controlling weight to a treating physician's opinion, *see Clifford*, 227 F.3d at 871, the ALJ did not provide any explanation for why Dr. Prasad's prior reports were inconsistent with the more recent July 2005 report, which was the articulated basis for not giving Dr. Prasad's opinion any weight.

In August 1999, Dr. Prasad mentioned that Ms. Koslow's response to Xanax was moderate, which is consistent with the July 2005 assessment that Ms. Koslow's symptoms were "not completely" controlled with medications. Dr. Prasad's treatment notes over the years indicate that Ms. Koslow continued to report periodic depression and that in July 2005, she reported that her medications "barely help me." R. 609. In August 1999, Dr. Prasad performed a comprehensive

assessment of the nature of Ms. Koslow's mental impairment and functional limitations, including that she would not be able to attend to simple repetitive tasks continuously for a two-hour duration, her symptoms would cause her to make "lots of errors" and she has "[very] poor tolerance" for situations commonly encountered at work such as regular attendance, completing tasks, interaction with supervisors, peers, etc. R. 357. Moreover, this Court has previously found that Dr. Prasad's August 1999 and April 2000 reports contained no significant internal inconsistencies and were not at odds with other substantial evidence and that the ALJ should have given Dr. Prasad's reports controlling weight. The ALJ failed to adequately explain the weight given to Dr. Prasad's opinion.

The Commissioner responds that the ALJ's decision is nevertheless supported by substantial evidence because the state agency psychologist opinions were supported by objective memory tests and clinical examination and because Dr. Jilhewar was able to review the entire record in providing his expert testimony at the hearing. In support of his first argument, the Commissioner points to state agency psychologist Dr. Pressner's opinion that Ms. Koslow was "moderately limited" in several areas but that this translated into an RFC for simple repetitive work. He further identifies the objective basis of Dr. Pressner's opinion as Ms. Koslow's WMS-II test scores that ruled out the alleged memory/concentration problems reported by Ms. Koslow. However, this opinion is undated and unsigned. In addition, the ALJ simply listed Dr. Pressner's unsigned, undated report along with other documents from physicians employed by the State Disability Determination Services in support of his RFC without further explanation. The ALJ does not specifically address Dr. Pressner's opinion or indicate why he may be giving it more weight than that of Dr. Prasad much less address the objective basis of the opinion. Therefore, although an ALJ may decide to grant more weight to the opinions of nonexamining state agency medical consultants than to a treating

psychiatrist, *see Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006), the ALJ in this case did not sufficiently articulate an explicit comparison, and the Commissioner's post-hoc analysis cannot be attributed to the ALJ. *Golembiewski v. Barnhart*, 382 F.3d 721, 725 (7th Cir. 2004). As for the Commissioner's reliance on Dr. Jilhewar's review of the record, Dr. Jilhewar explicitly testified that he addressed only Ms. Koslow's physical impairments and did not make a determination or provide any testimony regarding Ms. Koslow's mental impairments; thus, any review Dr. Jilhewar made of the state agency psychologist's opinion in the course of his review is irrelevant to the mental RFC.

Therefore, although the ALJ is not required to give any deference to Dr. Prasad's opinion that Ms. Koslow is "unable to work" as that is a legal decision reserved for the Commissioner, the ALJ is required to give Dr. Prasad's medical opinion controlling weight unless the ALJ identifies other evidence of record inconsistent with that treating opinion. The ALJ's failure to do so in this case constitutes error, and the ALJ must reevaluate whether Dr. Prasad's findings are entitled to controlling weight. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (explaining that ALJ's decision to accept one physician's opinion over another's without any consideration of the factors outlined in the regulations is reason for reversal); *Gudgel*, 345 F.3d at 470 ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence of record."); *see also Collins v. Astrue*, No. 08-2663, 2009 WL 1247188, *5 (7th Cir. May 7, 2009).

b. Dr. Marquis - combined effect of physical and mental impairments

In an April 2001 report following a comprehensive review of the medical records and a mental examination of Ms. Koslow, Dr. Marquis opined that Ms. Koslow would be unable to engage in gainful work. As with Dr. Prasad, the ALJ stated that he did not give "any significant weight"

to Dr. Marquis' opinion on the ground that it was unsupported by objective evidence in the record. R. 493. Plaintiff argues that the ALJ failed to explain why Dr. Marquis' observations of Ms. Koslow were inconsistent with Dr. Marquis' finding that Ms. Koslow could not engage in gainful employment as a result of the disabling effect of Ms. Koslow's *combined* physical and mental impairments, including "dyplopia, hearing impairment in right ear, episodes of falling, possible dizziness, as well as her memory disturbances." R. 576.

In his decision, the ALJ made no specific findings regarding Dr. Marquis' opinion, did not explain why he gave more weight to the state agency physicians, and did not address Dr. Marquis' finding of a combined effect. As with the lack of explanation regarding Dr. Prasad, this is error requiring remand. *See Collins*, 2009 WL 1247188 at *4, 5 (finding that in discounting the opinion of a treating physician who found limitations based on a combination of impairments, the ALJ failed to cite any other medical evidence of record and erred by substituting his own judgment for a physician's without relying on other medical evidence in the record) (citing *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Clifford*, 227 F.3d at 870; *Moss*, 555 F.3d at 561); *see also Green v. Apfel*, 204 F. 3d 780, 782 (7th Cir. 2000) (remanding because the ALJ "failed to consider the aggregate effect of Green's ailments").

*3. Credibility*

In the context of Dr. Marquis' report, Plaintiff argues that the ALJ's credibility determination is flawed because Dr. Marquis reported that Ms. Koslow did not appear to be exaggerating any of her symptoms, yet the ALJ found Ms. Koslow's testimony not fully credible or supported by the objective medical evidence of record without citing any relevant contradictory evidence.

In making a credibility determination, SSR 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR 96-7p. An ALJ is not required to give full credit to every statement of pain made by the claimant or to find that a disability exists each time a claimant states that he or she is unable to work, and a lack of objective evidence is one factor to be considered by the ALJ. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); 20 C.F.R. §§ 404.1529(c)(2) & 416.429(c)(2). However, SSR 96-7p provides that a claimant's statements regarding the intensity or persistence of her symptoms "may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p at *6. An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004)). Factors to be considered by an ALJ evaluating a claimant's complaint of pain or symptoms include:

(i)     The individual's daily activities;

(ii)    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(v)     Treatment, other than medication, the individual received or has received for relief of pain or other symptoms;

(vi)    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(vii)   Other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) & 416.929(c)(3); SSR 96-7p at *3.

In his credibility determination, the ALJ noted Ms. Koslow's complaints of tinnitus, lack of ear pain but sense of aural fullness in right ear, forgetfulness, performance of minimal household chores, difficulty cooking, difficulty standing for prolonged periods of time, and problems with her vision. He then found that the extent and frequency of symptoms reported by Ms. Koslow are "not fully credible or supported by the objective medical evidence of record" based on what he believed to be the appearance that her medications were helping to control her symptoms. R. 493. He reasoned that Ms. Koslow has been prescribed and has taken Zoloft, Paxil, and Valium, that there are no reported side-effects, and that they appear to control her symptoms because the record shows that she "has attempted to refill these prescriptions on several occasions." *Id.* He provided no other basis for his credibility determination.

However, during the April 2001 mental status evaluation, Ms. Koslow reported to Dr. Marquis the following limitations: performance of minimal to no household chores, difficulty cooking, difficulty standing, burning herself at times when removing hot food from the microwave, seeing two separate images from both her eyes with one image being over the other, forgetting things around the house, and forgetting her line of thought during a conversation. In his report, Dr. Marquis opined that Ms. Koslow did not appear to be exaggerating "any" of her symptoms, either psychiatric or physical. The limitations in daily activities reported by Ms. Koslow to Dr. Marquis are consistent with her hearing testimony. In addition, Ms. Koslow testified at the hearing that her medications take the edge off her depression and anxiety, but she reported effects of sleepiness and fatigue or tiredness from her medications.

In his credibility determination, the ALJ did not cite any medical evidence contrary to Dr. Marquis' observation that Ms. Koslow was not exaggerating her symptoms. Rather, in discounting her testimony, he relied solely on his conclusion that Ms. Koslow's medications were controlling her symptoms because she had attempted to refill her prescriptions. In addition to the ALJ drawing his own medical conclusions regarding the effects of her medications on her symptoms, the reasoning behind this basis for discrediting Ms. Koslow is flawed because the ALJ states that there are no reported side effects from the medication; however, Ms. Koslow testified that they make her tired and drowsy. Moreover, on July 5, 2005, Dr. Prasad issued a note that Ms. Koslow's anxiety and depression are "not completely controlled" by her medications, Xanax and Lexapro. R. 598. As discussed above, the ALJ has failed to adequately articulate why he has not given any significant weight to Dr. Prasad or Dr. Marquis' opinions. *See Villano*, 556 F.3d at 562 ("[T]he ALJ may not discredit a claimant's testimony about her pain and limitations *solely* because there is no objective medical evidence supporting it."); *see also Clifford*, 277 F.3d at 871-72; SSR 96-7p; 20 C.F.R. §§ 404.1529(c)(2) & 416.429(c)(2).

In addition, Ms. Koslow's reported daily activities were fairly restricted and are not of the type that undermine or contradict her claim of disabling symptoms. *See Zurawski*, 245 F.3d at 887 (finding that plaintiff's activities "are fairly restricted (e.g. washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain"); *Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"); *see also Carradine*, 360 F.3d at 755 ("[The ALJ] failed to consider the differences

between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week.").

Finally, as for the ALJ's unexplained discounting of Ms. Koslow's complaints of tinnitus and aural fullness in her right ear, Ms. Koslow consistently reported problems with dizziness and ringing in her right ear. In March 1999, Dr. Zeitoun noted that Ms. Koslow "had a problem with balance during the exam. The gait was unpredictable with no clear pattern [and she] gave the impression that she was unsteady." R. 236. Dr. Marquis noted in April 2001 that Ms. Koslow reported that her main difficulties were with her memory, dizziness, and problems with hearing in her right ear. In August 2004, Ms. Koslow reported to Dr. Brown, a clinical psychologist, hearing problems and difficulty locating sounds. A March 2005 evaluation of Ms. Koslow's hearing noted that she reported "high-pitched ringing that sometimes becomes like the sound of a freight train," which she finds "distressing and nerve racking." R. 582. The report found profound sensorineural hearing loss in the right ear.

The Commissioner's only response in support of the ALJ's credibility determination is that Dr. Pressner, a state agency psychologist, noted that Ms. Koslow's test scores ruled on her alleged memory/concentration problems and questioned her credibility in light of inconsistencies in the record. As discussed more fully above in Part B.2.a, this rationale is advanced by the Commissioner but was not relied on by the ALJ in his decision. *See Steele*, 290 F.3d at 941 (finding that the court must confine its review to the reasons supplied by the ALJ). Again, Dr. Pressner's report relied on by the Commissioner is unsigned and undated.

Accordingly, the Court finds that the ALJ's review of the evidence is incomplete and, based on the current state of the record, the Court finds that the ALJ's credibility determination is not

supported by substantial evidence of record.  Thus, this matter is remanded for further clarification on the issue of Ms. Koslow's credibility.

### C.  Unresolved Inconsistency in the ALJ's Credibility Determination

Finally, Plaintiff argues that there is an unresolved inconsistency in the ALJ's credibility findings.  In his formal findings, the ALJ rules that "[a]fter careful consideration of the entire record," Ms. Koslow's "assertions concerning her ability to work *are credible*."  R. 495 (emphasis added).  However, in the text of his decision, the ALJ reasons that Ms. Koslow's testimony is "*not fully credible* or supported by the objective medical evidence of record."  R. 493 (emphasis added).  Reading the ALJ's entire decision as a whole, the Court agrees with the Commissioner's assertion that the formal finding contains a typographical error and that the error is harmless.  *See Shramek v. Apfel*, 226 F.3d 809, 911 (7th Cir. 2000) (noting that the court gives an ALJ's "opinion a commonsensical reading rather than nitpicking at it").

In the same line of reasoning, Plaintiff argues that the ALJ failed to comply with SSR 96-8 in assessing Ms. Koslow's residual functional capacity.  SSR 96-8p requires the ALJ to include in his RFC assessment "a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  SSR 96-8p.  Plaintiff asserts that the ALJ did not base his RFC assessment on all relevant evidence in the record because at the hearing Ms. Koslow testified to many symptoms yet the ALJ did not take into account those symptoms in formulating the RFC.  However, Plaintiff makes this argument based on the typographical error in the ALJ's formal findings, which incorrectly stated that he found Ms. Koslow's testimony credible.  Again, the ALJ found in the body of his decision that Ms. Koslow

was not fully credible, which explains his decision not to rely on the identified aspects of her testimony.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the relief requested in Plaintiff's Social Security Opening Brief [DE 22]. The decision of the ALJ is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

SO ORDERED this 22nd day of May, 2009.


s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record